IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

ROY TROXEL,

        Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

        Defendant.

No. C13-0057

RULING ON JUDICIAL REVIEW

## TABLE OF CONTENTS

I.    *INTRODUCTION* ........................................ 2

II.   *PROCEDURAL BACKGROUND* ........................... 2

III.  *PRINCIPLES OF REVIEW* .............................. 3

IV.  *FACTS* ............................................... 4
    *A.*   *Troxel's Education and Employment Background* ......... 4
    *B.*   *Administrative Hearing Testimony* ..................... 5
          *1.*   *Troxel's Testimony* .......................... 5
          *2.*   *Vocational Expert's Testimony* ................ 6
    *C.*   *Troxel's Medical History* ........................... 7

V.   *CONCLUSIONS OF LAW* ............................... 10
    *A.*   *ALJ's Disability Determination* ..................... 10
    *B.*   *Objections Raised By Claimant* ..................... 13
    *C.*   *Reversal or Remand* .............................. 20

VI.  *CONCLUSION* ...................................... 21

VII. *ORDER* ........................................... 21

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Roy Troxel on June 5, 2013, requesting judicial review of the Social Security Commissioner's decision to deny his application for Title II disability insurance benefits. Troxel asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide him disability insurance benefits. In the alternative, Troxel requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On June 4, 2010, Troxel applied for disability insurance benefits. In his application, Troxel alleged an inability to work since January 15, 2010 due to uncontrolled blood pressure problems. Troxel's application was denied on June 30, 2010. On September 1, 2010, his application was denied on reconsideration. On October 7, 2010, Troxel requested an administrative hearing before an Administrative Law Judge ("ALJ"). On November 4, 2011, Troxel appeared via video conference with his attorney before ALJ Eric S. Basse for an administrative hearing. Troxel and vocational expert Elizabeth M. Albrecht testified at the hearing. In a decision dated January 26, 2012, the ALJ denied Troxel's claim. The ALJ determined that Troxel was not disabled and not entitled to disability insurance benefits because he was functionally capable of performing his past relevant work as a production assembler. Troxel appealed the ALJ's decision. On April 26, 2013, the Appeals Council denied Troxel's request for review. Consequently, the ALJ's January 26, 2012 decision was adopted as the Commissioner's final decision.

On June 5, 2013, Troxel filed this action for judicial review. The Commissioner filed an Answer on August 5, 2013. On October 11, 2013, Troxel filed a brief arguing that there is no substantial evidence in the record to support the ALJ's finding that he is not disabled and that he is functionally capable of performing his past relevant work as a

production assembler. On December 11, 2013, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On December 18, 2013, Troxel filed a reply brief. On August 16, 2013, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision

"extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Troxel's Education and Employment Background

Troxel was born in 1959. He graduated from high school. While in school, he took special education classes. Following high school, Troxel worked for many years at the Maytag Company as an unskilled assembler.

The record contains a detailed earnings report for Troxel. The report covers the time period from 1973 to 2011. Prior to 1976, Troxel had minimal earnings (less than $1,000). From 1976 to 1981, Troxel earned between $2,504.34 (1976) and $10,716.65 (1981). He had no earnings in 1982. From 1983 to 2009, Troxel earned between $5,115.72 (1985) and $35,411.29 (2003). He has no earnings since 2010.

### B. Administrative Hearing Testimony

### 1. Troxel's Testimony

At the administrative hearing, the ALJ asked Troxel about his academic skills. Specifically, the ALJ inquired whether Troxel has difficulty making change or adding and subtracting. Troxel replied that if he writes the numbers down, he can add and subtract. The ALJ also inquired about Troxel's ability to read. According to Troxel, he is capable of reading the newspaper "once and awhile," and reading mystery books "once in a great while."

Next, the ALJ asked Troxel to discuss his difficulties with his left shoulder and left hand:

> Q:   . . . Do you still have problems with your left arm?
> A:   Yes.
> Q:   And what is that like?
> A:   Every time at nights, when I'm sleeping, it -- you know, once it'll wake me up because there's a big old throbbing, like somebody stabbed me or something.
> Q:   What about during the day?
> A:   [Yes] during the day, too. And I have to kind of move my arm around and stuff.

| Q: | Do you have any problems using your left arm for reaching or grabbing things like boxes, or, you know, food out of the refrigerator, or, I don't know, tools, or something like that? |
|---|---|
| A: | As long as I don't have to reach above my head, I'll be able to -- I'm all right, there. |
| Q: | Do you have any problems holding onto things with your left hand -- I don't know, a glass, or bowl, or something? |
| A: | Yes. |
| Q: | What happens? |
| A: | I go to pick it up just so far and it just slides out of my hand again. . . . |
| Q: | So, do you have any difficulty using your left hand, though, for buttons, or zippers, or any find -- writing? Well, I guess you wouldn't write. Anything like that? |
| A: | No. |

(Administrative Record at 45-46.) Troxel also testified that he could only lift about 5 pounds with his left arm/hand.

The ALJ further inquired about Troxel's typical day. Troxel noted that he lives alone and typically does some cleaning around the house or watches television. Troxel also stated that he is able to do his own laundry and go grocery shopping.

### 2. Vocational Expert's Testimony

At the hearing, the ALJ provided vocational expert Elizabeth M. Albrecht with a hypothetical for an individual who:

> is capable of performing medium work. He should have no concentrated exposure to hazardous conditions. And he could only occasionally climb ropes, ladders, and scaffolds. Would such an individual have -- be able to perform any of his past relevant work?

(Administrative Record at 61.) The vocational expert testified that under such limitations, Troxel could perform his past work as a production assembler. The ALJ provided the vocational expert with a second hypothetical for an individual:

6

who has no limitations with his right upper extremity. But with his left upper extremity, he can lift five pounds. He should not perform repetitive gripping with his left hand. He should have no repetitive reaching overhead or at shoulder level with his left upper extremity. Again, he has no limitations to his right upper extremity. He should have no repetitive bending over and standing up. . . . He could perform work that needs little or no judgment to do simple duties. It can be learned on the job in a short period. And he should have no requirement to read instructions or write reports[.]

(Administrative Record at 62-63.) The vocational expert testified that under such limitations, Troxel, again, could perform his past work as a production assembler.

## C. Troxel's Medical History

On February 4, 2010, Dr. Britt Marcussen, M.D., wrote a letter to Troxel's employer stating that Troxel suffers from hypertension and takes three different medications to help control his high blood pressure. Dr. Marcussen opined that the combination of Troxel's hypertension and medications causes postural hypotension which results in dizziness. According to Dr. Marcussen, the hypertension and medications impair "his ability to work on the line where he does a lot of bending over and standing back up again."[1] Dr. Marcussen further noted that attempts to control Troxel's symptoms have been "unsuccessful and it may be that he may have some postural symptoms that persist at work. Reasonable accomodations would be putting him in a position where he doesn't have to bend over and stand up with any regularity. If these accommodations could be made it would be very helpful in controlling his symptoms."[2]

On June 28, 2010, Dr. Chrystalla Daly, D.O., reviewed Troxel's medical records and provided Disability Determination Services ("DDS") with a physical residual

---

[1] Administrative Record at 226.

[2] *Id.*

7

functional capacity ("RFC") assessment for Troxel. Dr. Daly determined that Troxel could: (1) occasionally lift and/or carry 50 pounds, (2) frequently lift and/or carry 25 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Daly found that Troxel could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Dr. Daly further determined that Troxel should avoid concentrated exposure to hazards such as machinery and heights. Dr. Daly found no manipulative, visual, or communicative limitations.

On November 8, 2010, Troxel was referred to Dr. Nan D. Marquardt, Ph.D., for a cognitive disability assessment. In discussing Troxel's cognitive background, Dr. Marquardt noted that:

> A psychological evaluation conducted when [Troxel] was sixteen found his overall cognitive abilities to be in the low average range, with performance abilities being better developed than verbal abilities. Reading was in the borderline range and math was in the low average range. He was enrolled in special education classes for the remainder of his high school years.

(Administrative Record at 381.) Dr. Marquardt further noted that after high school, Troxel found employment at the "Whirlpool factory," and remained employed there until January 2010, when he was placed on medical leave. Lastly, Dr. Marquardt noted that Troxel lived with his parents until their deaths in 1991, and has since lived by himself.

A cognitive status examination showed that Troxel scored in the borderline range when compared to others his age who had completed high school. Dr. Marquardt administered the Wechsler Adult Intelligence Scale--Fourth Edition ("WAIS-IV") test to measure Troxel's general intellectual functioning. Troxel's full-scale intelligence score was 74. His verbal comprehension score was 66, perceptual reasoning score was 82, and

working memory and processing speed scores were 83. Dr. Marquardt provided in-depth discussion of Troxel's scores as follows:

> Mr. Troxel's full-scale score was at the 4th percentile and places him in the borderline range of cognitive ability. Across the four scales, his performance varied. He scored in the deficit range on the Verbal Comprehension (1st percentile) scale. He scored in the low average range on the Perceptual Reasoning (14th percentile), Working Memory (13th percentile), and Processing Speed (13th percentile) scales. On the Perceptual Reasoning scale, Mr. Troxel's performance was uneven among the three subsets. He scored in the borderline range on Block Design and in the low average range on Visual Puzzles, both timed tests. He scored in the average range on Matrix Reasoning, a test that allowed him to solve problems at his own pace.

(Administrative Record at 382.) Dr. Marquardt concluded that based on his testing performance, Troxel would have difficulty learning material. Dr. Marquardt also noted that Troxel's memory is a personal strength, and is in the low average to average range. However, Dr. Marquardt indicated that Troxel read at a fourth grade level and performed math calculations at a fifth grade level. In summary, Dr. Marquardt determined that Troxel's overall cognitive ability was in the borderline range with academic skills in the deficit to borderline range.

On February 3, 2011, Troxel met with Karl M. Holmes, P.A., a treating source at Belle Plaine Family Practice in Belle Plaine, Iowa, regarding elevated blood pressure. Holmes noted that Troxel has an underlying medical diagnosis of hypertension with a history of hyperlipidemia and orthostatic hypotension. Troxel had been on medical leave from his job at Maytag for several months, but when he was released back to work, he was placed in the job that he would be expected to perform moving forward. Holmes noted that:

> when [Troxel] was trying to perform the job he did become dizzy and at that point felt that his blood pressure was

elevated. [He was t]hen sent to the nurse's office. When he was at the nurse's office his blood pressure was elevated systolically in the 170s to 180s and diastolically in the 90s and 100s. He at that point was told by management that the job that he was doing he would be unable to do and was then terminated.

(Administrative Record at 537.) Upon examination, Holmes diagnosed Troxel with hypertension, vertigo, and fatigue. Holmes recommended that Troxel continue on his medication regimen as treatment.

On May 6, 2011, Troxel was referred to Dr. F. Manshadi, M.D., for an independent medical examination. Dr. Manshadi reviewed Troxel's medical history and found that Troxel suffered from: (1) Left hand weakness with reduced sensation along the median digits, status post left carpal tunnel release in December 2006; (2) left-sided shoulder pain with reduced range of motion, status post left shoulder arthroscopic surgery on November 16, 2007 for superior labral repair and open biceps tenodesis; (3) weakness in left elbow flexors; and (4) subjective complaints of chronic low back pain. Upon examination, Dr. Manshadi determined that Troxel had a 5% permanent impairment of his left upper extremity based on his carpal tunnel syndrome. Dr. Manshadi further determined that Troxel had a 17% permanent impairment, again, of his upper left extremity based on his shoulder injuries. Dr. Manshadi opined that Troxel should: (1) avoid any activity requiring repetitious gripping with the left hand; (2) not lift more than 5 to 6 pounds with his left upper extremity; (3) avoid any activity requiring repetitious reaching at shoulder level or overhead; and (4) avoid using ladders or crawling.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Troxel is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42

(1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. § 404.1520(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant

work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 404.1545. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. § 404.1545.

The ALJ applied the first step of the analysis and determined that Troxel had not engaged in substantial gainful activity since January 15, 2010. At the second step, the ALJ concluded from the medical evidence that Troxel had the following severe impairments: degenerative joint disease of the left shoulder, left carpal tunnel syndrome, hypertension, idiopathic orthostatic hypotension, obesity, and borderline intellectual functioning. At the third step, the ALJ found that Troxel did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Troxel's RFC as follows:

> [Troxel] has the residual functional capacity to lift up to 5 pounds with the left upper extremity; he has no limitation with the right upper extremity. The individual should not perform repetitive gripping with this left hand. He should have no repetitive reaching overhead or at shoulder level with his left upper extremity. He should have no repetitive bending over and standing up. He can perform work that needs little or no judgment to do simple duties that can be learned on the job in

> a short period. He should have no requirement to read
> instructions or write reports.

(Administrative Record at 19.) Also at the fourth step, the ALJ determined that Troxel was capable of performing his past relevant work as a production assembler. Therefore, the ALJ concluded that Troxel was not disabled.

### B. Objections Raised By Claimant

Troxel argues that the ALJ erred in denying him benefits because he meets the criteria for benefits under Listing 12.05C, and should have been found disabled. In the alternative, Troxel argues that the ALJ erred by failing to find that he was presumptively disabled because he equals Listing 12.05C. Troxel maintains that this matter should be reversed and remanded for benefits, or at a minimum reversed and remanded for further consideration of Listing 12.05C and/or consideration of medical equivalence.

Listing 12.05C provides in pertinent part:

> Mental retardation: Mental retardation refers to significantly
> subaverage general intellectual functioning with deficits in
> adaptive functioning initially manifested during the
> developmental period; i.e., the evidence demonstrates or
> supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the
> requirements in A, B, C, or D are satisfied.
>
> . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through
> 70 and a physical or other mental impairment imposing an
> additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. In *Maresh v. Barnhart*, 438 F.3d 897 (8th Cir. 2006), the Eighth Circuit summarized the requirements of Listing 12.05C as follows:

> a claimant must show: (1) a valid verbal, performance, or full
> scale IQ of 60 through 70; (2) an onset of the impairment
> before age 22; and (3) a physical or other mental impairment

> imposing additional and significant work-related limitation of
> function.

*Id*. at 899.

Here, on the WAIS-IV, Troxel scored a full-scale IQ score of 74, verbal comprehension score of 66, and perceptual reasoning score of 82.[3] Clearly, Troxel's verbal comprehension score of 66 meets the first requirement for Listing 12.05C. However, in his decision, the ALJ discounted the validity of Troxel's verbal comprehension score. Specifically, the ALJ determined that:

> While a licensed psychologist, Nan D. Marquardt, Ph.D.,
> indicated results of the Wechsler Adult Intelligence Scale-
> Fourth Edition (WAIS-IV) were valid, the psychologist also
> stated results were variable in that [Troxel] demonstrated a
> verbal comprehension score of 66; perceptual reasoning score
> of 82; working memory score of 83; and processing speed of
> 83 resulting in a full scale IQ of 74. In consideration of the
> significantly variable scores as well as the full scale IQ of 74,
> the undersigned finds the requirements of paragraph C have
> not been met.

(Administrative Record at 19.)

In his brief, Troxel responds to the ALJ's findings on Listing 12.05C issue as follows:

> The ALJ cited to no medical or psychological authority which
> supports his opinion that variance among the test scores
> suggests that they are not valid. The Listing specifically states
> that when separate scores are given on the three scales, the

---

[3] The WAIS-IV replaced the WAIS-III in 2008. The terms "Verbal IQ" and "Performance IQ" from the WAIS-III were replaced with "Verbal Comprehension" and "Perceptual Reasoning" in the WAIS-IV. Verbal Comprehension and Perceptual Reasoning should be substituted for Verbal IQ and Performance IQ, respectively. *See Pierson v. Colvin*, 960 F. Supp. 2d 933, 936-37, nn. 4, 5 (S.D. Iowa 2013) (discussing the terminology changes from the WAIS-III to WAIS-IV).

> *lowest* score should be used to determine whether the claimant
> satisfies the Listing. Listing 12.00D(6)(c).

Troxel's Brief (docket number 14) at 11. In March 2012, following the ALJ's decision discounting Troxel's intelligence scores, Troxel contacted Dr. Marquardt seeking her opinion regarding the scores. In a letter dated March 29, 2012, Dr. Marquardt opined that:

> The WAIS-IV consists of ten subtests that are divided into four indexes, Verbal Comprehension (VC), Perceptual Reasoning (PR), Working Memory (WM), and Processing Speed (PS). The four indexes comprise the Full Scale Intelligence Quotient (FSIQ). The subtests are scored as scaled scores with a mean of 10 and a standard deviation of three. The indexes the FSIQ are scored as standard scores with a mean of 100 and a standard deviation of ten.
>
> For most people, the FSIQ is a good summary of ability. However, when twenty or more points separate the scores among the indexes (high score variability), the FSIQ is less meaningful (therefore less valid) as an overall description of intellectual ability (*WISC-IV Clinical Use and Interpretation*, p. 41). This is the reason why VC or the PR is sometimes used for eligibility decisions rather than the FSIQ. . . .
>
> Mr. Troxel, because there is a difference of sixteen points between his VC and PR, falls into the 'grey area' when deciding whether to base decisions on VC, PR, or FSIQ. Because he demonstrated greater variability among the three subtests that comprise the PR (scatter of five points between highest and lowest score, a difference greater than one standard deviation) and less among the three subtests that comprise the VC (scatter of two point[s] between highest and lowest score, a difference less than one standard deviation), the VC is probably the most meaning measure of his cognitive ability.

(Administrative Record at 554.) Dr. Marquardt offered these opinions after the ALJ's decision. The Court notes, however, that Dr. Marquardt's letter and opinions were

presented to the Appeals Council. In its decision, the Appeals Council stated that it considered this new evidence provided by Troxel, but found that it did not "provide a basis for changing" the ALJ's decision.[4]

When a reviewing federal court is confronted with new evidence provided to the Appeals Council, the Eighth Circuit Court of Appeals directs the reviewing court to consider the new evidence as part of the administrative record. In *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000), the Eighth Circuit explained that:

> The regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision. *See* 20 C.F.R. § 404.970(b). The newly submitted evidence thus becomes part of the 'administrative record,' even though the evidence was not originally included in the ALJ's record. *See Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir. 1992). If the Appeals Council finds that the ALJ's actions, findings, or conclusions are contrary to the weight of the evidence, including the new evidence, it will review the case. *See* 20 C.F.R. § 404.970(b). Here, the Appeals Council denied review, finding that the new evidence was either not material or did not detract from the ALJ's conclusion. In these circumstances we do not evaluate the Appeals Council's decision to deny review, but rather we determine whether the record as a whole, including the new evidence, supports the ALJ's determination. *See Nelson*, 966 F.2d at 366.

*Id.*; *see also Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008) (The final decision of the Commissioner should be affirmed if the decision "is supported by substantial evidence on the record as a whole, including the new evidence that was considered by the Appeals Council."); *Nelson*, 966 F.2d at 366 ("The newly submitted evidence is to become part of what we will loosely describe as the 'administrative record,' even though the

---

[4] Administrative Record at 2.

evidence was not originally included in the ALJ's record. . . . If, as here, the Appeals council considers the new evidence but declines to review the case, we review the ALJ's decision and determine whether there is substantial evidence in the administrative record, which now includes the new evidence, to support the ALJ's decision."). In *Riley v. Shalala*, 18 F.3d 619 (8th Cir. 1994), the Eighth Circuit noted that a reviewing court:

> must speculate to some extent on how the administrative law judge would have weighed the newly submitted reports if they had been available for the original hearing. We consider this to be a peculiar task for a reviewing court.

*Id.* at 622.

Here, the new evidence — Dr. Marquardt's opinions regarding the interpretation of Troxel's intelligence scores — suggests that Troxel's verbal comprehension score of 66 is valid. If the verbal score of 66 is valid, then Troxel meets the first requirement of Listing 12.05C. The ALJ did not address the remaining requirements of Listing 12.05C — manifestation of the impairment before age 22 and having a physical or other mental impairment imposing additional and significant work-related limitation of function — in his decision. Having reviewed the entire record, the Court believes there is evidence that Troxel meets the remaining requirements of Listing 12.05. Specifically, even though Troxel is a high school graduate, he was enrolled in special education classes for the majority of his schooling. Additionally, Dr. Marquardt noted that he read and performed math calculations at the level of an elementary school student. *See Maresh*, 438 F.3d at 900 (finding that a claimant meets the requirement of impairment onset before age 22 when he or she attended special education classes and had difficulties with reading, writing, and math); *see also Christner v. Astrue*, 498 F.3d 790, 793 (8th Cir. 2007) (same). There is also evidence in the record that Troxel suffers from additional physical impairments with work-related limitations of function. For example, by January 2010, Troxel was unable to perform his job at Maytag due to complications from high blood pressure and

hypertension which caused dizziness.[5] Furthermore, Dr. Manshadi determined that Troxel had permanent impairments with his left upper extremity causing limitations in lifting and reaching with his left arm.[6] In summary, because there is evidence in the record that (1) Troxel's verbal comprehension score of 66 is valid, (2) his intellectual impairment manifested prior to age 22, and (3) he suffers from additional physical impairments that limit his work-related abilities, the Court concludes that remand is necessary so that the ALJ can more fully consider and address whether Troxel meets Listing 12.05C. *See Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007) (providing that an ALJ has a duty to fully and fairly develop the record).

In the alternative, assuming Troxel's verbal comprehension score of 66 is not valid, Troxel argues that the ALJ erred because the ALJ did not address whether his impairments *equaled* Listing 12.05C. Troxel is correct. In *Shontos v. Barnhart*, 328 F.3d 418 (8th Cir. 2003), the Eighth Circuit Court of Appeals pointed out that the Commissioner issued instructions for determining medical equivalence in the Program Operations Manual System ("POMS"). *Id.* at 424. The applicable POMS provision for determining medical equivalence and mental retardation under Listing 12.05C states in pertinent part:

> Listing 12.05C is based on a combination of an IQ score with an additional significant mental or physical impairment. The criteria of this paragraph are such that a medical equivalence determination would very rarely be required. However, slightly higher IQ's (e.g. 70-75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation or function may support an equivalence determination. It should be noted that generally the higher the IQ, the less likely medical equivalence in combination with another physical or mental impairment(s) can be found.

---

[5] *See* Administrative Record at 536-537.

[6] *Id.* at 543-544.

POMS § DI 24515.056. In *Shontos*, the claimant had an IQ score of 72, and medical evidence from her treating doctors which indicated that she had difficulty with anxiety and depression which would interfere with her ability to work. 328 F.3d at 424. The ALJ who considered Shontos' claim did not consider the POMS guidelines. *Id*. The Eighth Circuit determined that the ALJ's failure to consider the POMS guidelines was error. *Id*. Specifically, the Eighth Circuit found that "[a]lthough POMS guidelines do not have legal force, and do not bind the Commissioner, this court has instructed that an ALJ should consider the POMS guidelines." *Id*. (citing *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000); *List v. Apfel*, 169 F.3d 1148, 1150 (8th Cir. 1999)). The Eighth Circuit concluded that Shontos' impairments, including borderline intellectual functioning, psychiatric affective disorders, and physical disabilities, were medically equivalent to Listing 12.05C, and remanded the case for an award of benefits. *Shontos*, 328 F.3d at 427.

Similar to *Shontos*, Troxel had a full scale IQ score of 74. Dr. Marquardt diagnosed Troxel with borderline intellectual functioning. Specifically, Dr. Marquardt opined that:

> Mr. Troxel's full-scale score was at the 4th percentile and places him in the borderline range of cognitive ability. Across the four scales, his performance varied. He scored in the deficit range on the Verbal Comprehension (1st percentile) scale. He scored in the low average range on the Perceptual Reasoning (14th percentile), Working Memory (13th percentile), and Processing Speed (13th percentile) scales.

(Administrative Record at 382.) Dr. Marquardt concluded that Troxel's overall congintive ability was in the borderline range with academic skills in the deficit to borderline range. Additionally as already discussed in this decision, there is medical evidence in the record that Troxel was unable to perform his job at Maytag due to complications from high blood

pressure and hypertension, including dizziness.[7] Furthermore, Dr. Manshadi determined that Troxel had permanent impairments with his left upper extremity causing limitations in lifting and reaching with his left arm.[8]

Based on the foregoing medical opinions, the Court finds that the ALJ's failure to follow the POMS guidelines, and consider whether Troxel's borderline intellectual functioning combined with his other significant physical impairments, were medically equivalent to Listing 12.05C, was error. *See Shontos*, 328 F.3d at 424-27. Accordingly, the Court determines that remand is necessary. On remand, the ALJ must determine whether Troxel's impairments are medically equivalent to Listing 12.05C.

### C. Reversal or Remand

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with our without remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> Where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his [or her] disability by medical evidence on the record as a whole, we find no need to remand.

*Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987); *see also Beeler v. Brown*, 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir. 1979) (explaining that reversal of denial of benefits is justified where no substantial evidence exists to support a finding that

---

[7] *See* Administrative Record at 536-537.

[8] *Id.* at 543-544.

the claimant is not disabled). In the present case, the Court concludes that the medical records as a whole do not "overwhelmingly support a finding of disability." *Beeler*, 833 F.2d at 127. Instead, the ALJ failed to: (1) fully and fairly develop the record with regard to whether Troxel meets Listing 12.05C; and (2) consider whether Troxel's borderline intellectual functioning combined with his other significant physical impairments, was medically equivalent to Listing 12.05C.

## *VI. CONCLUSION*

The Court concludes that this matter should be remanded to the Commissioner for further proceedings. On remand, the ALJ must fully develop the record with regard to whether Troxel meets listing 12.05C. The ALJ must also determine whether Troxel's impairments are medically equivalent to Listing 12.05C.

## *VII. ORDER*

For the foregoing reasons, it is hereby **ORDERED**:

This matter is **REVERSED** and **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed herein.

DATED this ___/ˢᵗ___ day of April, 2014.

_____
JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA